IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

DRIVERDO, LLC
d/b/a Draiver,

    *Plaintiff,*

v.

SLALOM, INC.
d/b/a Slalom Consulting,

    *Defendant/*
    *Counterclaim Plaintiff,*

v.

DRIVERDO, LLC
d/b/a/ Draiver

    *Counterclaim Defendant.*

Case No. 24-CV-2249-EFM-RES

**MEMORANDUM AND ORDER**

    Driverdo, LLC ("Draiver) and Slalom, Inc. ("Slalom") entered into several agreements, and Draiver's termination of those agreements resulted in disputes between the parties. Draiver first filed suit seeking damages for breach of contract and a declaration that Slalom's post-termination fees must be reduced. Slalom then filed a counterclaim asserting claims for breach of contract, fraud, a declaratory judgment on the basis of estoppel, breach of the covenant of good

faith and fair dealing, unjust enrichment, and quantum meruit. Before the Court is Counterclaim-Defendant Draiver's Motion to Dismiss Counts II-VIII of Counterclaim-Plaintiff Slalom's Counterclaims (Doc. 25). For the reasons stated in more detail below, the Court denies in part and grants in part Draiver's Motion.

## I. Factual and Procedural Background[1]

Draiver provides an AI and data-analytics based technology to coordinate the movement of vehicles. Slalom provides technology consulting services, including the design, development, testing, building, and management of technology solutions.

*Consulting Services Agreement ("CSA")*

In February 2023, Draiver and Slalom executed a CSA that provides that it is governed by the laws of the State of Washington. The CSA provides, in part, that "Slalom will provide consulting, technical or other professional services for [Draiver] as the Parties may agree from time to time ("Services") pursuant to each statement of work ("SOW") entered into" under the CSA. Pursuant to the CSA, Draiver "will provide such data, facilities, resources, and documentation necessary to facilitate Slalom's performance of the Services and will undertake such other tasks and responsibilities as may be set forth in the applicable SOW."

*The CSA's Acceptance and Termination Provisions*

Section 4.1 of the CSA provides that "[u]pon completion of each phase of the Services, [Draiver] shall have ten (10) days in which to accept or reject such Services and related Work . . . unless the SOW provides a different acceptance period." Acceptance is "deemed to have occurred

---

[1] The facts in this section are primarily taken from Slalom's Counterclaim and the contracts attached to the parties' pleadings. The facts are construed in Slalom's favor as Draiver is the party seeking dismissal.

following expiration of the Acceptance Period absent a written rejection delivered prior thereto." Pursuant to Section 4.2 of the CSA, "Slalom shall have fifteen (15) days, or such other period as otherwise agreed to or set forth in the SOW, to implement such changes as shall be reasonably required to bring the Services or Work in material conformity with the Specifications pursuant to Section 4.1 or to cure a breach of warranty pursuant to Sections 5.1" Section 4.3 of the CSA provides that "[i]n the event the corrected Services or Work do not conform materially to the Specifications or to the warranties set forth in Section 5.1 after two re-work attempts, [Draiver] may in its sole discretion . . . terminate the applicable SOW . . . ."

The CSA also includes a "Duration and Termination" provision. Specifically, Section 2.2 provides that Draiver

> may terminate this Agreement or reduce the scope or terminate any SOW at any time without liability, fee or penalty (except to pay for Services rendered prior to such termination) upon ten (10) days' prior written notice to Slalom. Slalom may terminate this Agreement without liability, fee or penalty upon ten (10) days' prior written notice to [Draiver] if there is no then-outstanding SOW. Either Party may terminate any incomplete SOW if the other Party is in default of any of its material obligations thereunder or under this Agreement and such default is not cured within twenty (20) days after written notice thereof. Notwithstanding the forgoing, no cure period shall be required for a default that: (i) is the result of gross negligence or willful misconduct; (ii) in the reasonable opinion of the Party seeking to terminate such SOW, cannot reasonably be cured; or (iii) results in irreparable or continuing harm to the Party seeking to terminate such SOW, and termination shall be effective upon written notice of such default.

Section 2.3 of the CSA provides that

> [i]f in either Party's reasonable judgment there is a material change in the scope, duration, requirements, assumptions, or dependencies described in a SOW, the Parties shall negotiate an appropriate Change Order in good faith . . . . If the parties are unable to agree to a Change Order, then either Party may, upon ten (10) days' prior written notice to the other Party, terminate the applicable SOW.

Pursuant to Section 2.5 of the CSA, "[Draiver] shall pay Slalom in accordance with Sections 1.2 and 1.3 of this Agreement for all undisputed amounts due for Services rendered and expenses incurred prior to the effective date of termination . . . ."

*The Statement of Work 2 ("SOW2")*

On August 30 and 31, 2023, Slalom and Draiver executed the SOW2, with an effective date of May 1, 2023. Section 2.1 of the SOW2 outlined the "Project Overview / Objectives." Section 2.2 defined Slalom's "Team Structure and Capacity" and "Activities." In addition, Section 2.2, entitled "Scope and Deliverables," set forth 14 Deliverables, describing the deliverable, key contributors, and expected date of completion. Of the 14 Deliverables set forth in this section, seven had defined expected due dates prior to December 20, 2023—the date Draiver purported to terminate the agreement. One of those Deliverables had an expected date of July 31, 2023—prior to the execution of the SOW2. Section 4 of the SOW2 outlined "Assumptions and [Draiver] Responsibilities," and Section 5.2 outlined Draiver's "Project Personnel."

*The SOW2's Acceptance and Termination Provisions*

Section 6.3 of the SOW2 provides, in part, that Draiver "will notify Slalom within ten (10) calendar days of receiving a Deliverable whether it accepts or rejects that Deliverable. If no notification is delivered to Slalom within this period, the Deliverable will be considered accepted." The SOW2 includes a section entitled "SOW Termination," providing that Draiver has "the absolute right at any time to terminate this Agreement by giving at least fifteen (15) days advance written notice." It also provides that "[i]n the event of termination, [Draiver] shall be liable for the payment of monthly fees, proportionately calculated until the point of termination, along with the charges for completed deliverables up to the termination date."

-4-

*Conflicts Between the CSA and the SOWs*

The CSA includes two provisions addressing conflicts between the CSA and any SOW. Section 13.13 states that "[i]n the event of any conflict or inconsistency between the terms of this Agreement and any SOW . . . the following general order of precedence shall apply: (a) the body of this Agreement; (b) the SOW . . . ." In addition, the CSA states that "[t]he only exception to this general order of precedence shall be where a SOW explicitly states the intention of the Parties to override this Agreement with specific reference to the applicable section of the Agreement to be superseded." Section 13.14 also provides that

> [i]n the event of any conflict or ambiguity between a provision in this Agreement and in a SOW that cannot be reasonably reconciled, the provision in this Agreement will govern unless such provision expressly provides otherwise or the SOW clearly intends to override the related provision in this Agreement, in which case such provision in the SOW shall apply but only with respect to that SOW.

*The SOW2's Fee Section and Draiver's Alleged Cash Problems*

Slalom alleges that Draiver faced pressure from its outside investor to minimize its cash burn and subsequently communicated its cash flow challenges to Slalom. In mid-July 2023, Slalom's managing director texted Draiver's CEO with a payment proposal for the SOW2 to help alleviate Draiver's "cash burn rate." Slalom proposed to "flatten the initial spike" by spreading Slalom's fees over many months and continuing to provide some support services, even though the bulk of Slalom's work was to be completed by the end of quarter one of 2024. Draiver responded by asking how far Slalom could stretch things out, and Slalom informed Draiver that if Draiver would agree to the staffing and payment structure being proposed in the SOW2, then Slalom could stretch the payments through quarter four of 2024. After Slalom confirmed Draiver's understanding that the structure proposed would equate to a $167,000 per month payment to Slalom, Draiver requested to have it included in the SOW2.

Section 6.1 of the SOW2 states that the "Estimated Total Service Fees" are $3,235,230, less some expenses, for a total of $3,026,230. Section 6.2 provides a fee schedule of $167,568 per month to be paid over 18 months. This provision also states that "[i]f Slalom maintains its performance and achieves the successful completion of the deliverables within the pre-established dates, Draiver shall compensate Slalom with the monthly fee as detailed in the following table." It also states "[f]or the avoidance of doubt, that fee disbursement is contingent upon the effective fulfillment of the preceding deliverables."

*Performance*

Slalom alleges that Draiver's leadership team and employees lacked the experience, knowledge, and expertise to adequately define the project's vision and communicate it to Slalom. Slalom states that it timely completed the Deliverables under the SOW2 that had specific completion dates. In addition, Slalom alleges that Draiver did not reject any of Slalom's Deliverables or provide notice to Slalom of non-acceptance or the opportunity to re-work any solution under the SOW2 or the CSA.[2]

*Purported Termination*

On December 20, 2023, Draiver's CFO sent an email stating "[t]his serves as a formal 15-day notification. After thorough consideration, Draiver decided to use its prerogative and terminate all active Statements of Work (SOWs) and to scale down the scope of SOW02, executed on August 31, 2023. Consequently, all Slalom resources not specifically mentioned below will no longer be

---

[2] The Court recognizes that Draiver alleges in its Petition that Slalom did not provide the resources necessary to complete the deliverables within the timeframes set forth in SOW2 and that it alleges that the parties discussed Slalom's performance, but the non-performance issues were not resolved by Slalom. The Court, however, must construe the facts as alleged by Slalom in its Counterclaim in Slalom's favor on Draiver's Motion to Dismiss. Furthermore, to the extent the parties allege conflicting facts, the Court cannot make a dispositive ruling on a motion to dismiss.

required after the 15-day period." Draiver then set forth three specific "contributors and respective deliverables" that "shall continue until further notice." Slalom alleges that Draiver's cash position at this time was even more dire than it had been previously and that Draiver effectively fired its CEO. Draiver subsequently purported to terminate the entirety of the CSA and the SOW2.

Slalom alleges that Draiver has failed to pay four specific invoices, totaling $718,940. In addition, Slalom contends that Draiver owes Slalom $1,513,918 for additional work that it already performed under the SOW2. Slalom states that Draiver has only paid $503,209, which leaves a balance of $2,523,020.96 due to Slalom.[3]

*Lawsuits*

On or about May 21, 2024, Draiver filed a Petition in Johnson County District Court asserting a breach of contract claim against Slalom. Draiver alleged that Slalom breached the CSA and the SOW2 by failing to provide services and Deliverables promised under the CSA, SOW1, CO1, CO2, and SOW2. Draiver claims that because of Slalom's contractual breaches, Draiver incurred added third-party fees, added internal resources costs, added AWS fees, and shutdown costs. In addition, Draiver seeks a declaratory judgment that Slalom's post-termination fees must be reduced to reflect the alleged non-completion of Deliverables under SOW1, CO1, CO2, and SOW2.

Slalom removed the case to this Court and then filed a Counterclaim asserting eight claims against Draiver. Slalom asserts three breach of contract claims against Draiver for failure to pay

---

[3] Slalom sets forth different numbers in its Counterclaim, and the Court is unclear as to the actual damages flowing from the alleged breach of contract. In one paragraph, Slalom states that it seeks $2,742,020.96 ($3,245,230 that it is owed minus the $503,209.04 that Draiver has already paid). But in another paragraph, it states that Draiver refuses to pay $2,523,020.96 ($3,026,230 minus the $503,209.04 that Draiver has already paid). Yet, Slalom also states that Draiver owes $2,232,858 ($718,940 plus $1,513,918).

invoices, failure to perform, and wrongful termination. In addition, Slalom asserts a fraud claim and seeks a declaratory judgment that Draiver should be estopped from relying on any purported failure by Slalom to perform as a basis to terminate or cancel the CSA or the SOW2. Slalom also asserts alternative claims for breach of the duty of good faith and fair dealing, unjust enrichment, and quantum meruit.

Draiver has now filed a Motion to Dismiss, seeking dismissal of Counts II through VIII.

## II.     Legal Standard

Under Federal Rule of Civil Procedure 12(b)(6), a defendant may move for dismissal of any claim for which the plaintiff has failed to state a claim upon which relief can be granted.[4] Upon such motion, the court must decide "whether the complaint contains 'enough facts to state a claim to relief that is plausible on its face.'"[5] A claim is facially plausible if the plaintiff pleads facts sufficient for the court to reasonably infer that the defendant is liable for the alleged misconduct.[6] The plausibility standard reflects the requirement in Rule 8 that pleadings provide defendants with fair notice of the nature of claims as well the grounds on which each claim rests.[7] Under Rule 12(b)(6), the court must accept as true all factual allegations in the complaint, but need not afford such a presumption to legal conclusions.[8] Viewing the complaint in this manner, the court must

---

[4] Fed. R. Civ. P. 12(b)(6).

[5] *Ridge at Red Hawk, LLC v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

[6] *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556).

[7] *See Robbins v. Oklahoma*, 519 F.3d 1242, 1248 (10th Cir. 2008) (citations omitted); *see also* Fed. R. Civ. P. 8(a)(2).

[8] *Iqbal*, 556 U.S. at 678–79.

decide whether the plaintiff's allegations give rise to more than speculative possibilities.[9] If the allegations in the complaint are "so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs 'have not nudged their claims across the line from conceivable to plausible.'"[10]

Although the Court generally does not consider documents outside the complaint on a motion to dismiss, there are some exceptions.[11] Specifically, the Court can consider "(1) documents that the complaint incorporates by reference, (2) documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity, and (3) matters of which a court may take judicial notice."[12]

## II.     Analysis

Draiver contends that seven of the eight counterclaims asserted against it by Slalom should be dismissed for failure to state a claim. The Court will first address Slalom's breach of contract claim for wrongful termination as that determination affects some of the other claims.[13] The Court will then address the remainder of the claims.

---

[9] *See id.* ("The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." (citation omitted)).

[10] *Robbins*, 519 F.3d at 1247 (quoting *Twombly*, 550 U.S. at 570).

[11] *Matney v. Barrick Gold of N. Am.*, 80 F.4th 1136, 1150 n.11 (10th Cir. 2023) (citing *Gee v. Pacheco*, 627 F.3d 1178, 1186 (10th Cir. 2010)).

[12] *Id.* (internal quotation marks and citation omitted).

[13] The Court notes that Draiver's factual background for its motion is extremely brief and primarily recites facts from Draiver's Petition—not from Slalom's Counterclaim. The Court considered the facts (and claims) asserted in Slalom's Counterclaim.

### A.     Count III – Breach of Contract (Wrongful Termination)

Slalom alleges that Draiver breached the contract and wrongfully terminated Slalom because Draiver was required to provide twenty days written notice of, and the opportunity to cure, any default. Slalom relies on the third sentence of Section 2.2 of the CSA to support this allegation.

Draiver contends that this claim should be dismissed because the agreement does not impose a "for cause" termination requirement on Draiver. Specifically, Draiver asserts that the straightforward language of the SOW2 allows Draiver "the absolute right at any time to terminate this [SOW2] by giving at least fifteen (15) days advance written notice." Furthermore, Draiver contends that the CSA provides that Draiver "may terminate this [CSA] or reduce the scope or terminate any SOW at any time without liability, fee or penalty . . . upon ten (10) days' prior written notice to Slalom."

Both parties rely upon contractual provisions to support their positions. Indeed, there are conflicting contractual provisions. On the one hand, the SOW2 provides that Draiver has the absolute right at any time to terminate the SOW2 with at least fifteen days written notice. The CSA also includes a provision stating that Draiver may terminate the CSA or reduce the scope or terminate any SOW at any time without liability upon ten days' prior written notice. On the other hand, the CSA includes another provision that provides that either party may terminate *if* the other party is in default of any of its material obligations and such default is not cured within twenty days after written notice. And Slalom alleges that Draiver violated this provision and did not provide the twenty days written notice or the opportunity to cure any default.

The CSA specifically addresses how to resolve conflicts or inconsistencies between the CSA and a SOW, and the CSA takes precedence. Thus, the termination provision in the CSA

prevails over the SOW2 termination provision. Unfortunately, the CSA also contains conflicting provisions in the Termination section, and thus the Court is left with conflicting language.

"The purpose of contract interpretation is to ascertain the intent of the parties."[14] "Clear and unambiguous contracts are enforced as written."[15] If language in a contract is susceptible to two different meanings or if "separate contractual provisions irreconcilably conflict," language in a contract is considered ambiguous.[16] "Contractual ambiguity presents a question of fact that can neither be determined as a legal matter nor resolved at the motion to dismiss stage."[17]

Here, the CSA contractual provisions irreconcilably conflict because one provision allows Draiver to terminate at any time without liability upon ten days' prior written notice but another provision states either party may terminate *if* the other party is in default *and the default is not cured* within twenty days written notice. Slalom alleges that Draiver violated this provision by not giving written notice of Slalom's default and by not allowing twenty days to cure. Thus, Slalom plausibly asserts a breach of contract claim for wrongful termination based on one of the contractual provisions in Section 2.2.[18] Thus, the Court denies Draiver's request to dismiss this claim.

---

[14] *Block Mining, Inc. v. Hosting Source, LLC*, 2024 WL 3012948, at *6 (W.D. Wash. June 14, 2024) (quoting *Kelley v. Tonda*, 393 P.3d 824, 829 (Wash. Ct. App. 2017)).

[15] *Id.* (quoting *Grey v. Leach*, 244 P.3d 970, 975 (Wash. Ct. App. 2010)).

[16] *Id.* (citing *Radliff v. Schmidt*, 532 P.3d 622, 625 (Wash Ct. App. 2023)).

[17] *Id.* (quotation marks, alterations, and citations omitted).

[18] The Court notes that the next sentence states "[n]otwithstanding the forgoing, no cure period shall be required for a default that: (i) is the result of gross negligence or willful misconduct; (ii) in the reasonable opinion of the Party seeking to terminate such SOW, cannot reasonably be cured; or (iii) results in irreparable or continuing harm to the Party seeking to terminate such SOW, and termination shall be effective upon written notice of such default." There are no allegations or facts before the Court presently that bring this provision into question.

B.      **Count II – Breach of Contract (Failure to Perform)**

Slalom alleges that Draiver beached its contractual obligations and failed to perform under the SOW2 and CSA. It contends that to the extent the project contemplated by the CSA and the SOW2 failed, that failure was caused by Draiver's breaches and failure to perform. Slalom alleges that Draiver's breaches and failure to perform caused Draiver to purport to terminate the CSA and the SOW2. Slalom contends that it is entitled to what it expected to be paid under the contract—$2,523,020.06—for Draiver's alleged breaches.

Draiver asserts that Slalom's theory presumes that Draiver needed a "cause" to terminate the CSA/SOW2. It contends that no breach of contract exists when Draiver had the unfettered right to terminate the contract. As noted above, however, there are conflicting contractual provisions regarding Draiver's right to terminate the contract. Furthermore, even if Draiver had the absolute right to terminate the contract, Draiver still had a duty to perform under the contract and could have committed its own breaches. Simply having the ability to terminate without cause does not alleviate Draiver's responsibilities or duties under the contract.

Draiver also contends that Section 13.9 of the CSA precludes Slalom's claim for expectation damages. This section provides that neither party "shall be liable hereunder for any incidental, indirect, special, consequential, punitive or exemplary damages, lost profits, lost sales, or anticipated orders . . . even if a party was informed or knew or should have known of the possibility of such damages or loss." Draiver argues that despite this provision, Slalom seeks recovery of unpaid monthly payments.

Slalom's claim, however, does not appear to be premised on incidental, indirect, or consequential damages. Instead, Slalom contends that the damages come directly from Draiver's

alleged breach of the contract. Accordingly, this contractual provision limiting incidental damages may not be relevant to this claim. In any event, at this stage of the proceedings, the Court cannot find that Slalom's claim is precluded by this provision.[19] Thus, the Court finds that Slalom states a claim, and Draiver's request to dismiss this claim is denied.

## C.     Count IV – Fraud

Slalom alleges that Draiver had self-inflicted cash flow problems and made its cash-flow problems known to Slalom. Slalom contends that Draiver asked Slalom how long Slalom could stretch out Draiver's payment obligations in the SOW2, and Slalom told Draiver that it could stretch Draiver's payment obligations through the fourth quarter of 2024 if Draiver intended to complete the project. Draiver confirmed the monthly fee of $167,000 per month and asked that Slalom put it in the SOW2. Slalom alleges that Draiver knew that it did not intend to make payments and that it did not intend to complete the project. Slalom contends that had it known that Draiver did not intend to complete the project or make the payments, it would not have agreed to the SOW2's monthly payment structure.

A fraud claim under Washington law has nine elements. These include:

(1) a representation of an existing fact; (2) the fact is material; (3) the fact is false; (4) the defendant knew the fact was false or was ignorant of its truth; (5) the defendant intended the plaintiff to act on the fact; (6) the plaintiff did not know the fact was false; (7) the plaintiff relied on the truth of the fact; (8) the plaintiff had a right to rely on it; and (9) the plaintiff had damages.[20]

---

[19] The Court notes that Slalom may not be entitled to *all* the damages it seeks because Slalom's recovery will be "limited to the loss he has actually suffered by reason of the breach." *Rathke v. Roberts*, 207 P.2d 716, 721 (Wash. 1949) (quoting 15 Am. Jur. 442, § 43, "Breach of Contract")). In addition, to the extent that Slalom is seeking incidental damages, Slalom may not be entitled to those damages. Finally, the Court notes that the numbers set forth in the Counterclaim are sometimes conflicting. The Court, however, cannot conclusively determine at this point that Slalom's damages are precluded. The Court notes that Slalom will be required to demonstrate the damages flowing from the breach of contract.

[20] *Baddeley v. Seek*, 156 P.3d 959, 961 (Wash. Ct. App. 2007) (citation omitted).

Draiver argues that Slalom fails to state a claim because Slalom cannot satisfy the first, sixth, seventh, and eighth elements of the claim. The Court will only address the first element.

As to the first element, Draiver asserts that a representation related to future payments or completing a project does not relate to an existing fact. Indeed, under Washington law, "[a] promise of future performance is not a representation of an existing fact and will not support a fraud claim."[21] Slalom's claim is based on allegations that Draiver misrepresented its intention to complete the project or make payments on the project in the future. This type of allegation is insufficient to state a claim for fraud.[22] Accordingly, the Court dismisses Slalom's fraud claim.

**D.      Count V – Declaratory Judgment (Estoppel)**

Slalom alleges that the CSA and the SOW2 gave Draiver ten days to accept or reject a deliverable. It contends that it delivered services under the CSA and the SOW2 and that Draiver never rejected any of Slalom's services. Slalom seeks a declaration that estops Draiver from relying on any purported failure by Slalom as Draiver's basis to terminate or cancel the CSA or the SOW2.

Draiver contends that this claim fails because Draiver did not need a "basis" to terminate Slalom because the CSA/SOW2 allowed for termination without cause. As noted above, however, the CSA contains conflicting provisions relating to termination. Thus, the Court cannot grant dismissal of this claim on this basis.

---

[21] *W. Coast, Inc. v. Snohomish Cnty.*, 48 P.3d 997, 1000 (Wash Ct. App. 2002) (citation omitted); *see also Shook v. Scott*, 353 P.2d 431, 433 (Wash. 1960) ("The first essential [element of a fraud claim] is that the statement be a representation of an *existing fact*.").

[22] *See Segal Co. (E. States), Inc. v. Amazon.Com*, 280 F. Supp. 2d 1229, 1232 (W.D. Wash. 2023) (noting that the "plaintiffs' fraud claim rests on the fact that defendant misrepresented its intent to fulfill a future promise [and,] [a]s a matter of law, this allegation cannot provide a basis for a fraud claim.").

Furthermore, the Court notes that in Draiver's Complaint against Slalom, it alleges that Slalom breached the contract by not providing the resources necessary to complete the workstreams or deliverables and that it repeatedly discussed Slalom's non-performance. Draiver alleges that following Slalom's consistent failures, Draiver asked Slalom to document that it delivered, and that Draiver received, the workstreams and deliverables. Draiver contends that Slalom could not demonstrate completion nor comply with the deliverable-related requirements. Thus, there are competing factual allegations in Draiver's Complaint and Slalom's Counterclaim regarding the deliverables.

Draiver, however, also asserts that because Slalom seeks relief in the form of damages, it has an adequate legal remedy and cannot seek declaratory relief. Draiver's argument as to this contention is brief and underdeveloped.[23] In addition, the Court notes that Draiver, in its own Complaint, seeks a declaratory judgment that Slalom either failed to complete, or timely complete the Deliverables under the terms of the agreements. Accordingly, the Court denies Draiver's request to dismiss this claim.

E.    **Count VI – Breach of the Duty of Good Faith and Fair Dealing**

In Count VI, Slalom alleges that it states this claim in the alternative. Slalom contends that even if Draiver was authorized to terminate the CSA and/or the SOW2 in its discretion, it was obligated to exercise that discretion in good faith. Slalom alleges that Draiver's termination was not motivated by perceived or real shortcomings but instead was based on its "prerogative" to terminate. It asserts that Draiver's exercise of that discretion violated the covenant of good faith

---

[23] Draiver references the federal declaratory-judgment statute, but it does not explicitly discuss the factors in this case.

and fair dealing. Draiver argues that Slalom's claim is subject to dismissal because the SOW2 and the CSA allow Draiver the right to exercise a "no cause" termination and Slalom improperly seeks to amend that language to impose a "for cause" requirement in determining whether to terminate.

"Although there is a duty of good faith and fair dealing implied in all existing contracts, [Washington courts] have consistently held there is no 'free-floating' duty of good faith and fair dealing that is unattached to an existing contract."[24] "The duty exists only in relation to performance of a specific contract term."[25] Courts "will read an implied covenant of good faith and fair dealing into a contract 'when the contract gives one party discretionary authority to determine a contract term.'"[26] However, "it does not apply to *contradict* contract terms."[27] "[C]ovenants of good faith and fair dealing do not trump express terms or unambiguous rights in a contract."[28]

Here, Slalom's claim for breach of the duty of good faith and fair dealing is based on the contractual provision that Draiver could terminate the agreement "at any time without liability, fee or penalty (except to pay for Services rendered prior to such termination) upon ten (10) days' prior written notice to Slalom." Slalom does not bring a breach of contract claim on this specific provision.[29] Thus, it cannot impose free floating good faith and fair dealing on this provision.

---

[24] *Keystone Land & Devel. Co. v. Xerox Corp.*, 94 P.3d 945, 949 (Wash. 2004) (citation omitted).

[25] *Id.* (internal quotation marks and citation omitted).

[26] *Myers v. State*, 218 P.3d 241, 244 (Wash. Ct. App. 2009) (quoting *Goodyear Tire & Rubber Co. v. Whiteman Tire, Inc.*, 935 P.2d 628, 632 (1997)).

[27] *Goodyear Tire*, 935 P.2d at 632 (citation omitted).

[28] *Myers*, 218 P.3d at 244 (citation omitted).

[29] Although Slalom brings two breach of contract claims, those breach of contract claims are based on different contractual provisions.

Furthermore, this particular provision appears to give Draiver the discretion to terminate at any time. Thus, Slalom fails to state a claim for breach of the duty of good faith and fair dealing. Accordingly, the Court grants Draiver's Motion to Dismiss this claim.

## F.     Counts VII – Unjust Enrichment and Count VIII – Unjust Quantum Meruit

Slalom also asserts these two claims in the alternative. As to Count VII, Slalom alleges that it conferred a benefit on Draiver in its delivery of products and services described in the CSA and the SOW2, and Draiver retained the products and services, without just compensation to Slalom. In Count VIII, Slalom alleges that it provided products and services of value to Draiver, the provision of which is not covered by any written contract between the parties, and Slalom is entitled to the quantum meruit payment for the services it provided.

Draiver contends that quantum meruit is available only in the absence of an express contract. In addition, Draiver argues that unjust enrichment is a method of recovery when a contract does not exist. Because a contract exists, Draiver contends that these claims must fail.

"Under long standing Washington law, '[a] party to a valid express contract is bound by the provisions of that contract, and may not disregard the same and bring an action on an implied contract relating to the same matter, in contravention of the express contract.'"[30] "'Quantum meruit' . . . is the method of recovering the reasonable value of services provided under a contract implied in fact."[31] And "[u]njust enrichment is the method of recovery for the value of the benefit retained absent any contractual relationship because notions of fairness and justice require it."[32]

---

[30] *Woodard v. Boeing Emps. Credit Union*, 2023 WL 4847126, at *5 (W.D. Wash. July 28, 2023) (quoting *Chandler v. Wash. Toll Bridge Auth.*, 137 P.2d 97, 103 (Wash 1943)).

[31] *Young v. Young*, 191 P.3d 1258, 1262 (Wash. En. Banc. 2008) (citations omitted).

[32] *Id.* (citation omitted).

"[C]ourts will not allow a claim for unjust enrichment in contravention of a provision in a valid express contract."[33]

Here, there are written contracts between the parties. And Slalom's unjust enrichment and quantum meruit claims relate to the same subject matter as Slalom's breach of express contract claims. Thus, Slalom has no right to recover under these two theories. Accordingly, the Court dismisses Slalom's quantum meruit and unjust enrichment claims.

**IT IS THEREFORE ORDERED** that Counterclaim Defendant Draiver's Motion to Dismiss Counts II through VIII (Doc. 25) is **GRANTED IN PART** and **DENIED IN PART**. Counts II, III, and V remain, and Counts IV, VI, VII, and VIII are **dismissed**.

**IT IS SO ORDERED.**

Dated this 5th day of September, 2025.

ERIC F. MELGREN
UNITED STATES DISTRICT JUDGE

---

[33] *Hurlbut v. Crines*, 473 P.3d 263, 270 (Wash. Ct. App. 2020) (quoting *MacDonald v. Hayner*, 715 P.2d 519, 523 (Wash Ct. App. 1986)).